UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JAVARIUS RUSSELL                                                    PLAINTIFF

v.                                                    CIVIL NO. 3:23-CV-500-DPJ-ASH

CITY OF LEXINGTON, et al.                                          DEFENDANTS

ORDER

Plaintiff Javarius Russell claims officers with the City of Lexington Police Department

(LPD) violated his constitutional rights.  Three motions pend.  Defendants the City of Lexington,

Charles Henderson, Cordarius Epps, and Brad Stanley moved for judgment on the pleadings

[38], Defendant Sam Dobbins filed a separate motion for judgment on the pleadings [48], and

Russell filed a motion [62] for leave to file a second Amended Complaint (SAC).  All motions

are opposed.

The Court finds that Russell's § 1983 Fourth Amendment and Fourteenth Amendment

claims (other than equal protection) are barred under *Heck v. Humphrey*[1] and that his proposed

SAC is futile as to those claims.  Russell also lacks standing to pursue injunctive relief for third

parties, and Defendant Henderson is entitled to qualified immunity as to the Fourteenth

Amendment equal-protection claim.  Otherwise, Defendants' motions are denied, and Russell

will be allowed to amend as to the non-dismissed claims.

I.      Facts and Procedural History

These facts are taken from the First Amended Complaint (FAC).  On December 31, 2021,

Russell, a Black man, was arrested and detained during a traffic stop outside of Lexington,

Mississippi.  FAC [35] ¶ 2.  On that evening, former LPD Chief of Police Sam Dobbins pulled

---

[1] 512 U.S. 477, 487 (1994).

Russell over believing that he was responsible for hitting and damaging another officer's car.  *Id.* ¶ 56.  Though an officer on the scene told Dobbins that Russell was not the right person, Dobbins still arrested Russell and held him in the Holmes County Jail over the holiday weekend. *Id.* ¶¶ 59–60.  Russell faced charges for unauthorized vehicle, felony fleeing, aggravated assault on a law-enforcement officer, and malicious mischief.  *Id.* ¶ 67.

While being held, Russell says Dobbins offered to drop those charges if Russell agreed to pay Dobbins more than $2,700 in cash to repair the police car.  *Id.* ¶ 70.  According to Russell, another officer, Defendant Chris Henderson, encouraged Russell to pay Dobbins, saying it was a "good deal."  *Id.* ¶ 71. Russell did not, however, take that deal.  *Id.* ¶ 77.

So on January 3, 2022, Russell appeared before a judge and bail was set at $80,000.  *Id.* "Russell's family engaged a bail agent to post a surety bail bond on his behalf and, on information and belief, on January 6, 2022, Russell was released from Holmes County Jail."  *Id.* ¶ 78.  "Russell's $8,000 bond premium and a $200 cash fine payment to the Lexington Municipal Court [were] paid in full and have not been refunded."  *Id.*

Aggrieved, Russell sued the City of Lexington, Dobbins, and three other officers, alleging constitutional violations related to his December 31, 2021 arrest and subsequent detention.  Russell filed his FAC on March 11, 2024.  Defendants then filed motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) [38, 48], and Magistrate Judge Andrew S. Harris stayed discovery pending resolution of those motions.

Meanwhile, the Department of Justice began investigating the LPD in November 2023 and issued a report of its findings on September 24, 2024.  DOJ Rep. [62-2] (attached to SAC). Russell now seeks to amend the FAC to include "new and relevant information" that was discovered during the DOJ investigation.  Pl.'s Mem. [63] at 2.  Defendants oppose the motion.

That presents an odd procedural posture because Defendants ask the Court to dismiss the FAC, which Russell seeks leave to amend. Defendants' arguments as to both motions tend to overlap—they say the FAC fails to state a claim for the same reasons the proposed SAC is futile. They also oppose amendment for other procedural reasons. The Court will start by addressing the procedural arguments for denying leave to amend and then address the Rule 12(c) and futility arguments together as to the specific claims.

II.    Motion to Amend

    A.    Standard

Federal Rule of Civil Procedure 15(a)(1)(A) allows a party to amend a pleading as a matter of course within 21 days after serving the pleading. A party may amend pleadings outside of this three-week window "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The rule instructs that "[t]he court should freely give leave when justice so requires." Indeed, "Rule 15(a) evinces a bias in favor of granting leave to amend." *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016) (quoting *Herrmann Holdings, Ltd v. Lucent Techs., Inc.*, 302 F.3d 552, 566 (5th Cir. 2002)) (internal quotation marks omitted).

"It is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 330 (1971). But "it is by no means automatic." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993). Accordingly, "the district court may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Id.*

B.    Analysis

Defendants say Russell should not be allowed to file the proposed SAC because it is futile, results from undue delay, would cause prejudice, and relies on inadmissible hearsay. As noted, the futility arguments overlap Defendants' Rule 12(c) motions, so they will be addressed separately. The other arguments are not persuasive.

1.    Prejudice

"Prejudice occurs where the delay that would result from granting leave to amend 'hinders the opposing party's ability to respond to the proposed amendment or to prepare for trial.'" *United States v. Dawn Prop., Inc.*, No. 1:14-CV-224-LG-JCG, 2016 WL 9245470, at *5 (S.D. Miss. June 22, 2016) (quoting *Dueling v. Devon Energy Corp.*, 623 F. App'x 127, 130 (5th Cir. 2015)). There may, for example, be prejudice "if the amendment is asserted after the close of discovery; after dispositive motions have been filed, briefed, or decided; or on the eve of or in the middle of trial.'" *Id.* It can also occur "if an added claim would require the defendant to reopen discovery and prepare a defense for a claim different from the [one] . . . that was before the court." *Smith v. EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004).

But that's not the case here; discovery hasn't started, and Russell admits that his proposed SAC adds no new claims or theories. Pl.'s Mem. [63] at 4. Though inconvenient for Defendants, answering the SAC does not cause undue prejudice, and this Order addresses their dispositive motions, so there should be no redundancy. *See Tesla, Inc. v. La. Auto. Dealers Ass'n*, No. CV 22-2982, 2023 WL 9059650, at *5 (E.D. La. Jan. 11, 2023) (finding that filing second motion to dismiss may be inconvenient but it "cannot be the type of undue prejudice necessary to foreclose amendment under Rule 15"). The Court finds no undue prejudice. *See Dueling*, 623 F. App'x at 131 (holding that district court abused its discretion in denying leave to

amend where there was no pretrial scheduling order or discovery cutoff date and time to file dispositive motions had not lapsed).

### 2. Delay

The Court acknowledges the time it has taken to reach this point, but the DOJ report that motivated the motion for leave to amend was published on September 26, 2024, and Russell moved to amend November 11, 2024. That delay is not unreasonable given the time required to consider the DOJ findings and prepare an amended pleading. And the information contained in that report should be included in the interest of justice. Thus, there is no undue delay, bad faith, or dilatory motive by Russell.

### 3. Admissibility

Defendants also argue that the DOJ report attached to the SAC constitutes inadmissible hearsay and lack of personal knowledge. Defs.' Resp. [64] at 5. Defendants' only cited authority for this argument denied a hearsay objection as moot, noting that the party "may reassert these objections at a later time." *Mace v. Republic Health Corp.*, No. 3:21-CV-1709, 2022 WL 2918107, at *4 (N.D. Tex. July 25, 2022). It's unclear whether that court would allow hearsay objections under Rule 12(b)(6), but it also noted with respect to the objection that "a district court may take judicial notice of publicly available documents produced by agencies, such as transcripts, which are directly relevant to the issue at hand" and that attached reports "may be considered part of the pleadings." *Id.* at *4 n.3.

Other courts have more clearly rejected Defendants' argument. *See Insuremax Ins. Agencies, Inc. v. AEA Ins. Agencies, Inc.*, No. SA-13-CA-317-FB, 2014 WL 12481353, at *8 (W.D. Tex. Nov. 6, 2014), *report and recommendation adopted*, No. CV SA-13-CA-317-FB, 2014 WL 12481354 (W.D. Tex. Dec. 3, 2014) (rejecting argument that exhibits to complaint

must be disregarded under Rule 12(c) because they were "unauthenticated and inadmissible hearsay"); *Williams v. Allstate Indem. Co.*, No. 4:22-CV-79-DMB-DAS, 2022 WL 17254306, at *3 n.3 (N.D. Miss. Nov. 28, 2022) ("Notably, Allstate provides no authority to support its argument that consideration of hearsay—which is generally prohibited under the Federal Rules of Evidence—in a complaint is improper on a motion to dismiss where the allegations of the complaint are taken as true."). Along with that, Rule 12(b) contains no counterpart to Rule 56(c)(2). That rule allows objections to summary-judgment evidence that "cannot be presented in a form that would be admissible at trial."

In sum, the procedural objections to Russell's motion to amend are not compelling. As noted, under Rule 15(a)(2), "[t]he court should freely give leave when justice so requires." And that's the case here. The remaining question is whether the amendments would be futile. Some of them would be for the same reasons they cannot survive under Rule 12(c). Those claims will be dismissed but leave to amend will extend for the surviving claims.

III.    Motion for Judgment on the Pleadings/Futility

A.    Standard

"A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). And so are futility objections under Rule 15. *Thomas*, 832 F.3d at 590.

For both, the "[C]ourt accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (per curiam)). But the Court will not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Watkins v. Allstate Prop. & Cas. Ins. Co.*, 90 F.4th 814, 817

(5th Cir. 2024) (quoting *King v. Baylor Univ.*, 46 F.4th 344, 356 (5th Cir. 2022)).  "Conclusory" means "[e]xpressing a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dict.* (11th ed. 2019), *quoted in Favela v. Collier*, 91 F.4th 1210, 1213 (5th Cir. 2024).

To overcome a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  "This standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

Finally, Russell's FAC and proposed SAC both attach supporting exhibits.  "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

B.      Analysis

1.      Section 1983 Claims

Section 1983 provides relief against any "person" who, "under color of" state law, deprives another of his or her "rights . . . secured by the Constitution."  Russell pleads six constitutional claims:  (1) Fourth Amendment unlawful arrest against Dobbins; (2) Fourth Amendment unlawful detention (*Manuel*[2] claim) against Dobbins, Epps, and Stanley; (3)

---

[2] *See Manuel v. City of Joliet*, 580 U.S. 357 (2017).

Fourteenth Amendment unlawful detention against Dobbins, Epps, and Stanley; (4) Fourth Amendment *Monell*[3] claim against the City of Lexington for unconstitutional arrests and detentions under LPD senior policymaker Dobbins; (5) Fourth Amendment *Monell* claim against City of Lexington for failure-to-investigate, failure-to-train, and failure-to-supervise related to policy and custom of unconstitutional arrests and detentions; and (6) Fourteenth Amendment equal protection against Dobbins and Henderson.

a.    Unlawful-Arrest-and-Detention-Based Claims

Defendants say all § 1983 claims other than equal protection are barred under *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). Defs.' Reply [47] at 1. For that reason, those claims in the FAC should be dismissed, and they would be futile if asserted in the proposed SAC. The Court agrees that *Heck* (if applicable) would reach the § 1983 claims other than equal protection, and Russell has not disputed that assertion.

"*Heck* explained that a prisoner may not 'seek[ ] damages in a § 1983 suit' if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence.'" *Gray v. White*, 18 F.4th 463, 467 (5th Cir. 2021) (quoting *Heck*, 512 U.S. at 487). "The *Heck* rule applies whether a plaintiff is currently incarcerated or not." *Collins v. Dall. Leadership Found.*, 77 F.4th 327, 330 (5th Cir. 2023) (citing *Randell v. Johnson*, 227 F.3d 300, 301 (5th Cir. 2000)). So "[a] § 1983 claim which falls under the rule in *Heck* is legally frivolous unless the conviction or sentence at issue has been reversed, expunged, invalidated, or otherwise called into question." *Hamilton v. Lyons*, 74 F.3d 99, 102 (5th Cir. 1996) (citing *Boyd v. Biggers*, 31 F.3d 279, 283 (5th Cir. 1994)).

---

[3] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Defendants insist that Russell triggered *Heck* by paying fines for the charges he faced. But Russell says he was never convicted.  That raises two questions.  First, were fines paid to resolve Russell's charges?  Second, is that enough under *Heck*?

***Russell's allegations about the fine***.  Russell says in the FAC that Dobbins offered to drop the charges if Russell paid more than $2,700.  FAC [35] ¶ 70.  But Russell apparently declined and went before a judge who set bail at $80,000.  *Id.* ¶ 77.  Then,

> Russell's family engaged a bail agent to post a surety bail bond on his behalf and, on information and belief, on January 6, 2022, Russell was released from Holmes County Jail.  Russell's $8,000 bond premium and a $200 cash fine payment to the Lexington Municipal Court have been paid in full and have never been refunded.

*Id.* ¶ 78.[4]

Russell acknowledges that he used the word "fine" in his FAC, but argues that his pleading "lacks other, basic factual allegations that could give any credence" to Defendants' *Heck* argument.  Pl.'s Resp. [44] at 4.  According to Russell, he never "allege[d] what the 'fine' was for . . . , who or what entity received the 'fine' payment," or who paid it.  *Id.*

These arguments conflict with Russell's pleading and the documents he attached to it. Starting with the purpose of the fines, Russell made his "Criminal Records" and exhibit to the FAC.  *See* Crim. Rec. [35-1] at 3–10.  For each disputed charge, those records first provide the amount of the "Fine & Assessments" and then check the box for "Fine Paid."  For example, the Criminal Record for the Unauthorized Vehicle violation shows this:

---

[4] The proposed SAC says basically the same thing but increases the amount of the paid fines. *See* SAC [62-1] ¶ 113.





*Id.* at 3–4.  Similar records exist for the other charges.  *See, e.g.*, *id.* at 9–10 (noting fine for

malicious mischief).  And, of course, he pleads that fines were "paid in full."  FAC [35] ¶ 78.

As for the argument that Russell never pleaded who received those funds, paragraph 78

of his FAC says the fine was paid "to the Lexington Municipal Court."  And that again seems

consistent with Russell's Criminal Records.  *See, e.g.*, Crim. Rec. [35-1] at 4.  Russell is correct

that the pleadings fail to disclose who funded those fines.  But he has neither explained why that

matters nor cited any authority suggesting it does.  In any event, the Criminal Records indicate

the money was paid for his criminal charges.  *Id.*

Viewed in the light most favorable to Russell, fines associated with the now-disputed criminal charges were paid in full to resolve those charges. There is no suggestion that he accepted Dobbins's offer to settle the charges off the books or that he paid the LPD rather than the court. *See* FAC [35] ¶ 78. He posted bond, went before a judge, and his Criminal Records show that fines were paid associated with those charges. As he states in his FAC, those fines were never returned. *Id.*

**The legal impact of those fines.** The parties next dispute whether paying the fines constitutes a conviction under *Heck*. Defendants note *Owens v. Kelly*, a case from the Mississippi Court of Appeals stating that "payment of a typical traffic fine . . . may be more akin to a plea of nolo contendere." 191 So. 3d 738, 744 (Miss. Ct. App. 2015). And, as Defendants observe, "a plea of nolo contendere is a conviction that implicates *Heck*." *Olivier v. City of Brandon*, No. 22-60566, 2023 WL 5500223, at *4 (5th Cir. Aug. 25, 2023) (unpub.).

*Owens* was a civil traffic-accident case. At trial, the court allowed the defendant truck driver to cross examine another driver about a ticket she received after the accident for failing to yield. 191 So. 3d at 739. The trial court allowed the evidence mostly to impeach any attempts by the ticketed driver to blame the defendant. On appeal, the defendant cited *Seals v. St. Regis Paper Co.*, in which a driver was examined about a ticket. 236 So. 2d 388 (Miss. 1970). The Mississippi Supreme Court said in that case that the questioning was proper because "a plea of guilty in a criminal case is admissible in a civil suit growing out of the same offense." *Id.* at 392. The *Owens* court was "hesitant" to follow *Seals*, most notably because "*Seals* refers to 'a plea of guilty,' whereas payment of a typical traffic fine such as the one in this case may be more akin to a plea of nolo contendere." 191 So. 3d at 744. The distinction mattered because Mississippi Rule of Evidence 410 precludes the use of a nolo contendere plea as evidence of liability.

Russell urges the Court to reject *Owens* as an irrelevant evidentiary ruling. But *Owens* considered the legal implications of a paid fine, and nothing in it suggests anything less than a nolo contendere conviction. While it may not be a "guilty plea"—as in *Seal*—the court concluded that it was more "akin" to nolo contendere. *Id.* And it based that finding on a case from a neighboring state and on an opinion from the Mississippi Attorney General. *Id.* at 744 n.5 (citing *Williams v. Brown*, 860 S.W.2d 854, 856 (Tenn. 1993); Miss. Atty. Gen., Opinions Div., Letter to the Office of the State Auditor, July 23, 2009 (approving form and content of "Uniform Traffic Ticket" advising that payment of fine by mail "shall be tantamount to entry of a plea of nolo contendere")).

More recently, United States District Judge Tom S. Lee considered this same issue in another case from the City of Lexington, *Reeves v. Dobbins*, No. 3:23-CV-333-TSL-MTP. Judge Lee noted, "While the drug charge against Reeves was dismissed, he paid the fines for the window tint and no insurance infractions and thus stands convicted of these offenses for *Heck* purposes." *Id.*, Order [298] at 4 (citing *Wilson v. Midland County.*, No. 22-50998, 2024 WL 4178185, at *2 (5th Cir. Sept. 13, 2024) (holding that "favorable termination requirement is . . . concerned with all § 1983 claims by all civil plaintiffs who seek civil remedies against defective criminal processes")); *see also Jew v. Dobbins*, No. 3:23-CV-2983-CWR-LGI, 2024 WL 4610589, at *4 (S.D. Miss. Oct. 29, 2024) (noting without deciding that fine payment could constitute nolo contendere plea but finding fact question whether fine was paid).

Against this backdrop, the Court agrees that paying a fine to resolve the criminal charges was at least a nolo contendere plea. Russell rejected a deal to pay Dobbins directly and avoid having the charges "recorded." FAC [35] ¶ 73. The fines were paid in full and never returned, the charges appear on his "Criminal Record[s]," and they have not been invalidated. *Heck*

applies. *Olivier*, No. 22-60566, 2023 WL 5500223, at *4. And that bar extends equally to the individual Defendants and the City. *Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996) (affirming *Heck* dismissal of Fourth Amendment § 1983 claims against municipality and individual defendants).

As for leave to amend, Defendants say Russell's proposed SAC still fails the *Heck* bar. Russell addresses that in his reply, but he mostly reasserts the same arguments he made when opposing the motion to dismiss. *See* Pl.'s Reply [66] at 3. He does, however, add this: "[T]he payment of these illicit fines and fees in exchange for a release from custody for an illegitimate arrest is not akin to a conviction, *which Plaintiff's proposed amendments further support. See, e.g.*, ECF No. 62-1 Ex. A, at ¶¶ 56–65." *Id.* (emphasis added).

Russell never explains how these cited paragraphs state a claim that could survive *Heck*. They don't. Those paragraphs allege an unconstitutional "Cash Bond" scheme through which arrestees pay the LPD cash and never see a judge. SAC [62-1] ¶¶ 56–65. Russell describes this as an "extra-judicial 'guilty' plea on an accused, who is forced to pay an unlawful 'Cash Bond' to secure release for an illegitimate arrest." *Id.* ¶ 65. But these paragraphs never say Russell paid an extra-judicial cash bond. Indeed, he didn't. *Id.* ¶107. Russell instead appeared before a judge, he paid a bail premium, and the various fines related to his arrest were paid. SAC [62-1] ¶¶ 111, 112, 113. In any event, *Heck* would bar an arrest premised on "a for profit policing scheme." *LaMartina v. Madden*, No. 24-30381, 2025 WL 33472, at *2 (5th Cir. Jan. 6, 2025) (cleaned up) (affirming *Heck* dismissal).

Viewing the facts in the light most favorable to Russell, a judgment for him on the § 1983 claims (other than equal protection) "would necessarily imply the invalidity of his conviction." *Heck*, 512 U.S. at 487. Russell says as much when he argues that the paid fees were "illicit" and

the arrest was "illegitimate." Pl.'s Reply [66] at 3. As a result, Defendants' motions for judgment on the pleadings are granted, and the proposed SAC is futile. These claims are dismissed with prejudice to their being asserted again until Russell satisfies the *Heck* conditions. *See Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir. 1996) (finding claims are properly "dismissed with prejudice . . . until the *Heck* conditions are met").

          b.      Equal-Protection Claim

"The equal protection clause essentially requires that all persons similarly situated be treated alike." *Glass v. Paxton*, 900 F.3d 233, 244 (5th Cir. 2018) (citation omitted). Russell asserts an equal-protection claim against Dobbins and Henderson under the Fourteenth Amendment for alleged racial discrimination. The claim against Dobbins is based on two things: (1) selective enforcement related to stopping and arresting Russell and (2) attempts to extort Russell by offering a "deal" to pay cash for release. *See* FAC [35] ¶¶ 125–127. Russell says Henderson engaged in racial discrimination by encouraging Russell to take that deal. *Id.* ¶ 73.

***Equal-protection claim against Henderson.*** Russell claims Henderson "acted with an intentionally discriminatory purpose when encouraging Russell to accept the 'deal' Dobbins offered him." *Id.* ¶ 128. That is, "Henderson told Russell that Dobbins had offered him a 'good deal,' especially because there would not be a 'record.'" *Id.* ¶ 73.

Russell *may* have waived that claim. Although he opposed Henderson's motion to dismiss, his subsequent reply in support of his motion to amend stated that the proposed SAC stated an equal-protection claim against Dobbins—he didn't mention Henderson. *See* Pl.'s Reply [66] at 2; *see Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022) ("A plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims.").

Even if he intended to pursue that claim in the SAC, Russell fails to show that his equal-protection claim survives Henderson's right to qualified immunity. Qualified immunity protects government officials from individual liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Good v. Curtis*, 601 F.3d 393, 400 (5th Cir. 2010) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). When a defendant asserts qualified immunity, "the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). And if the defense is raised in a motion to dismiss, "it is the defendant's conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness.'" *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).

To defeat qualified immunity, a plaintiff must show "(1) the official violated a statutory or constitutional right; and (2) the right was clearly established at the time of the challenged conduct." *Khan v. Normand*, 683 F.3d 192, 194 (5th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "The court need not decide the first question before the second, and it may decide the case solely on the basis that the right was not clearly established." *Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022) (citing *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)). The Court takes that approach here.

"To be 'clearly established' for purposes of qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Kinney v. Weaver*, 367 F.3d 337, 349–50 (5th Cir. 2004) (quoting *Anderson*, 483 U.S. at 640). The test is objective—would "all reasonable officials in the defendant's circumstances [have] known" that his conduct violated federal law—rather than

subjectively examining the [defendant's] actual beliefs." *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001). "Ultimately, '[t]he dispositive question is whether the violative nature of the particular conduct is clearly established.'" *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

This standard "is difficult to satisfy." *Id.* (citation omitted). "To show the law is clearly established, a party must 'identify a case where an officer acting under similar circumstances . . . was held to have violated'" the plaintiff's rights. *Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). And "[t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 577 U.S. at 12 (citations omitted, punctuation altered). Courts "must ask 'not only whether courts have recognized the existence of a particular constitutional right, but also . . . whether that right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct.'" *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (quoting *McClendon*, 305 F.3d at 331). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.[5]

Russell starts by saying Henderson has a pattern of discriminating against other Black people. Pl.'s Mem. [44] at 23–24. But this is an objective test, so Henderson's "subjective intent . . . is irrelevant." *Sanchez v. Swyden*, 139 F.3d 464, 467 (5th Cir. 1998). And even if he

---

[5]"[T]here can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 64 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 199 (2004)). This is not one of those cases.

discriminated in the past, that does not show that Henderson's alleged conduct—telling Russell that Dobbins had offered a "good deal"—violated clearly established equal-protection law.

Russell next attempts to distinguish Defendants' authority, but he offers no cases showing Henderson's alleged conduct violated his rights. *Nerio*, 974 F.3d at 575. Russell needs to cite a case that would let "all reasonable officers" know that telling him Dobbins's deal was good violated the Equal Protection Clause. *Thompson*, 245 F.3d at 457. Russell has not met that burden in the FAC, and he cites nothing in the SAC that would remedy his pleadings. Henderson is entitled to qualified immunity from the equal-protection claim (assuming it wasn't waived). Leave to amend would be futile.

***Equal-protection claim against Dobbins.*** The equal-protection claim against Dobbins is different. Russell says Dobbins engaged in selective enforcement related to his arrest, his detention, and the later deal. In general, Russell claims that Dobbins arrested him for allegedly wrecking his ATV into a patrol car even though an officer at the scene said Russell didn't do it. FAC [35] ¶ 59. Russell was then taken to jail, where other charges were added, and he was given the choice to pay Dobbins to fix the patrol car in exchange for dismissing those charges. *Id.* ¶ 70.

According to Dobbins, that "claim fails, ***full stop***, because [Russell] has failed to identify a similarly-situated comparator that was treated differently under all 'relevant respects.'" Dobbins Reply [55] at 16 (citing *Villarreal v. City of Laredo*, 94 F.4th 374 (5th Cir. 2024)).

To begin, Dobbins relies mostly on *Villarreal*. In that case, the plaintiff brought an equal-protection claim and a First Amendment retaliation claim related to her arrest. As Dobbins argues, the Fifth Circuit affirmed dismissal of the equal-protection claim because Villarreal failed to identify a comparator in the complaint. 94 F.4th at 398. But after Dobbins filed his

briefs, the Supreme Court vacated *Villarreal* "for further consideration in light of *Gonzalez v. Trevino*, 602 U.S. 653 . . . (2024) (per curiam)."  *Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). Though the Supreme Court did not say which ruling required further consideration, it was probably the First Amendment holding and not the equal-protection holding because *Trevino* addresses the former.[6]  Even so, *Villarreal* was vacated.[7]

The question is whether Russell must identify a specific person in his complaint to avoid dismissal or is it enough to assert other facts that "raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements."  *In re S. Scrap Material Co., LLC*, 541 F.3d at 587 (quoting *Twombly*, 550 U.S. at 556).

The standards for § 1983 equal-protection claims are essentially the same as those under Title VII.  *Hopkins v. Wayside Sch.*, No. 23-50600, 2024 WL 3738478, at *12 (5th Cir. Aug. 9, 2024) (citing *Lauderdale v. Tex. Dep't of Crim. Just.,* 512 F.3d 157, 166 (5th Cir. 2007)).  And at the Rule 12(b)(6) stage, a plaintiff must "plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make his case plausible."  *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595, 600 (5th Cir. 2021) (quoting *Chhim v. Univ. of Tex.*, 836 F.3d 467, 470 (5th Cir. 2016)).

---

[6] In *Trevino*, the Supreme Court rejected the Fifth Circuit's requirement that plaintiffs claiming First Amendment retaliatory arrests "use specific comparator evidence."  602 U.S. at 658.

[7] There may be another potential problem with *Villarreal*—it addressed a class-of-one equal-protection claim rather than a protected-class claim.  In *Gibson v. Texas Department of Insurance*, the Fifth Circuit noted that plaintiffs "must *either* allege that (a) 'a state actor intentionally discriminated against [him] because of membership in a protected class[,]' *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir.1999) (citation omitted), *or* (b) he has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' *Vill. of Willowbrook v. Olech*, 528 U.S. [at 564]."  700 F.3d 227, 238 (5th Cir. 2012) (emphasis added).  This suggests different tests for class-of-one and protected-class cases.  *Williams* is a protected-class case, 180 F.3d at 701, and *Village of Willowbrook* is a class-of-one case, 528 U.S. at 565.

One of those ultimate elements is whether Russell was treated less favorably than persons outside his protected class. *See Samaad v. City of Dallas*, 940 F.2d 925, 941 (5th Cir. 1991). But that might mean identifying a comparator group. *Id.* (finding plaintiffs failed to identify similarly situated community treated more favorably). And it doesn't mean he must name a comparator now.

In an analogous Title VII context, the plaintiff in *Olivarez* failed to name a comparator in the complaint. 997 F.3d at 600. The Fifth Circuit noted that omission but didn't stop there as Dobbins now urges. The court held: "And comparator allegations aside, the complaint presents no other facts sufficient to 'nudge[ ] [the] claims across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 547); *see also Johnson v. Johnson*, 385 F.3d 503, 531 (5th Cir. 2004) (rejecting argument that equal-protection plaintiff must identify specific comparator in complaint) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002) (holding that Title VII plaintiff need not plead facts showing prima facie case of discrimination)).

None of Dobbins's cited cases reject that approach. As noted, *Villarreal* has been vacated. And the cases Dobbins footnoted on this point arose mostly under Rule 56, not Rule 12(b)(6). *See generally* Dobbins Mem. [49] at 10 n.53, n.54. None of them hold that a complaint *must* name an individual comparator to survive, and the most analogous case observed: "To maintain an equal[-]protection claim, a plaintiff *typically alleges* that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 213 (5th Cir. 2009) (emphasis added) (citation omitted). In that case, the court found no valid comparator, but it also considered the other pleaded facts. *Id.*

There may be complaints that cannot survive without identifying a comparator (like when the pleaded facts do not otherwise present a plausible protected-class claim). But here, the non-conclusory facts in the FAC—when viewed in the light most favorable to Russell— "nudge [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In addition, even if the FAC fails to state a claim against Dobbins, the SAC offers much more. As detailed under the Title VI analysis, the DOJ report offers non-conclusory facts that plausibly suggest Dobbins began a pattern of discriminatory traffic stops against Black motorists after arriving in Lexington. It also gives examples of White motorists who were not arrested after traffic violations, statistical evidence indicating disparate treatment of Black people, and quotes from former LPD officers and other city officials stating that discrimination occurred. *See generally* DOJ Report [62-2].

As a final note, qualified immunity would not save Dobbins on this claim. Dobbins's qualified-immunity argument as to the equal-protection claim focuses on the sufficiency of Russell's pleaded facts. Dobbins does not seriously argue that the clearly established law would allow selective enforcement like the allegations here. Nor could he. "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race" even when probable cause exists. *Whren v. United States*, 517 U.S. 806, 813 (1996). Dobbins's motion to dismiss is denied; Russell's motion for leave to amend is granted.

2.    Title VI Claim Against the City

Russell brings a Title VI race-discrimination claim against the City. Title VI of the 1964 Civil Rights Act provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

To establish a Title VI claim, Russell must show: "(1) the defendant engaged in *intentional* discrimination based on race, color, or national origin; and (2) that the defendant received federal financial assistance." *Pathria v. Univ. of Tex. Health Sci. Ctr.*, 531 F. App'x 454, 455 (5th Cir. 2013) (per curiam) (emphasis in original) (citing 42 U.S.C. § 2000d). And to "survive the 12(b)(6) motion, the facts [Russell] alleged . . . must allow us reasonably to infer that the alleged discrimination was motivated by his" race. *Id.* at 456 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

The City generally asserts that Russell's complaint is too conclusory to state a claim because it fails to "contain a single allegation of discriminatory intent on the part of the institutional defendants." Defs.' Mem. [39] *Id.* at 24 (emphasis added) (quoting *Price ex rel. Price v. La. Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009)). Russell responds by simply repeating a conclusory assertion from his FAC; he offers neither legal authority nor analysis. Pl.'s Mem. [44] at 31.

Whether the FAC states a claim under Title VI is a closer question than whether the proposed SAC does. As noted, the SAC adds the results of the DOJ investigation. That document is attached to the SAC and is therefore within the proper scope of review. *See Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (noting that court's review includes "any documents attached to the complaint"). So the non-conclusory facts reflected in that report must be viewed in the light most favorable to Russell. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

DOJ "found that Lexington had a 'pattern or practice' that "[d]iscriminates against Black people," DOJ Report [62-2] at 54, including "arresting Black people who commit traffic offenses

21

while letting white people who commit similar traffic offenses leave without consequences," *id.*

at 55.  It supported those conclusions with these findings, quoted from the report:

- [A] former LPD officer leaked an audio recording of Dobbins using a racial slur while bragging about shooting someone.  In the recording, Dobbins said, "I shot that n----- 119 times, okay?"  *Id.* at 59.

- We reviewed body-worn camera video of every incident with reported force from November 2022 through January 2024.  . . .  In all the incidents we reviewed, we never saw LPD use force against a white person.  We only saw LPD use force against Black people.  *Id.* at 72.

- In our review of a random sample of arrests from 2022 and 2023, a third of the people who LPD arrested had to pay old fines to secure their release.  Every one of them was Black.  *Id.* at 77.

- Black people in Lexington bear the brunt of LPD's actions.  When LPD began to increase its revenue through aggressive low-level and often illegal arrests, racial disparities in arrests sharply increased.  In other words, LPD not only made dramatically more arrests under its new enforcement strategy; LPD made more arrests of Black people compared to white people than it had before.  *Id.* at 85.

- Of the fines and fees paid by residents of Lexington (excluding those paid by people from other towns), about 98% was paid by Black people.  *Id.* at 85.

- We found that LPD deliberately targets Black people when carrying out its low[-]level enforcement strategy.  *Id.* at 85.

- LPD's discriminatory pattern of enforcement began under Chief Dobbins.  *Id.*

- [A] former LPD officer explained, because Black people in Lexington have fewer resources to combat injustices, LPD may target Black people simply because they believe they are more likely to get away with it.  *Id.*

- An Alderman told us he repeatedly chastised Dobbins for calling Black men "boy" and explained that this was a derogatory term.  But citizens told him it constantly kept happening.  The Alderman said he discussed the issue with the Mayor, but they took no action against the Chief.  *Id.* at 85-86.

- We asked both the Mayor and one of the Aldermen if they considered investigating whether Dobbins's practices were tainted by racism or disproportionately harmed Black people.  They did not.  "He was gone, so there wasn't any need to look back," the Mayor told us.  "*The problem* was gone."  *Id.* at 86 (emphasis added).

- We found a statistically significant increase in racial disparities that started in July 2021, when Dobbins launched his low-level enforcement strategy. . . . After LPD's strategy changed in July 2021, the odds that a person LPD cited was Black increased by 27%, and the odds that a person LPD arrested was Black increased by 125%. To illustrate this increase in disparities another way, in 2019, Black people were 2.5 times more likely to be arrested by LPD than white people. But by 2022, Black people were 12 times more likely to be arrested.



*Id.* at 86-87.

- Using LPD's own data, we counted cases where the sole charges were traffic violations. . . . LPD went from arresting only three people for traffic offenses in 2017 to 102 people in 2022 and 79 in 2023. Within Holmes County, such high arrest rates for traffic violations appear to be unusual. In 2022, LPD jailed nearly four times as many people for traffic violations as five neighboring jurisdictions, plus the Holmes County Sheriff's Office, combined. And while carrying out the unusual decision to aggressively arrest for traffic offenses, LPD primarily arrested people who were Black. Although white people comprise about a fifth of Lexington's population, in 2022 and 2023, LPD arrested only four white people for traffic offenses—about two percent of the traffic arrests. *Id.* at 88.

- Compared to white people, LPD is much more likely to arrest Black people who commit [violations of] traffic laws instead of merely citing them. LPD arrested Black people instead of citing them 16.4% of the time[] but arrested white people instead of citing them only 2.9% of the time. And those results may be low because DOJ could not track the people who were merely allowed to leave. *Id.*

- To better understand LPD officers' interactions with people of different races, we also reviewed body-worn camera footage of all of LPD's stops—including those where officers did not cite or arrest anyone. For this analysis, we reviewed all available body-worn camera footage from a randomly selected sample of 61 days between November 2022 and November 2023. Again, we found striking differences in how LPD officers treat Black people compared to white people, particularly with respect to vehicle stops. In our sample, we found and reviewed body-worn camera footage from 205 vehicle stops. Although more than 20% of Lexington's population is white, white people constituted only about 11.7% of the vehicle stops (24 of the 205 stops). In each of those 24 stops of white drivers, LPD claimed that the person had violated traffic laws, yet cited only four of them, and arrested only one (DUI). We found 181 stops of Black drivers in our sample (about 88%). LPD made citations or arrests in nearly half of them (45.8%). Of the 43 Black drivers LPD arrested, more than half of the arrests (53.4%) were solely for traffic offenses. This pattern—arresting Black people for traffic offenses while citing white people or letting them go—is consistent with former LPD officers' accounts. One former officer told us that he regularly saw LPD let white people leave without a ticket after a stop. But LPD "never did that for people who were Black. They would arrest the person and take their car." *Id.* at 89.

- When LPD officers stopped Black drivers, they required the driver to get out of the car nearly one third of the time (28.3% of stops). They required white drivers to get out of the car in 8.3% of stops. LPD searched Black people or their property in nearly one fifth of stops (18.8%). But in our entire sample, LPD never searched a white person, their vehicle, or their property. *Id.*

- [A] former officer said,"LPD is more focused on Black people because it is easier for them to be abused, rights to be taken, stripped, dulled down." *Id.* at 91 (brackets omitted).

- [O]fficers stopped a white woman for disregarding a yield sign and speeding. She immediately argued with the officer, protesting[,] "What do you mean failure to yield? The whole road is blocked off!" This officer began to write her a ticket, but his partner suggested they give her a warning. "No," the first officer replied, "Cause then we'll be racist." But the woman made a phone call, and soon after, the officers received a message from the dispatcher: "We've been advised to inform you to stand down." *Id.*

The City urges the Court to reject these findings, noting that in other cases against it, the plaintiffs' allegations proved false. Defs.' Mem. [64] at 5–6. But that exceeds the scope of the Court's review. The Court must not only assume the well-pleaded facts are

true, it must view them in the light most favorable to Russell.  *Martin K. Eby Constr. Co.*, 369 F.3d at 467.

There's more in the DOJ report, but these facts—and those pleaded in the SAC— allow the Court "reasonably to infer that the alleged discrimination was motivated by" Russell's race.  *Pathria*, 531 F. App'x at 455.  He has pleaded a plausible Title VI claim, at least in the SAC.  Plaintiff's motion for leave to amend the facts supporting the Title VI claim is not futile and therefore granted.  Defendants' motion to dismiss this claim in the FAC is considered moot.

### 3.    Injunctive Relief

Russell seeks an injunction preventing:

1.    Defendants from interfering with the Fourth and Fourteenth Amendment rights of persons, including by (a) arresting and imprisoning them without probable cause or on purely pretextual grounds or (b) holding them without the opportunity to make an initial appearance before a judge in the time required under Mississippi law;

2.    Defendants from soliciting or accepting cash payments of any kind except in strict accordance with the controlling codes and statutes of the State of Mississippi, local rules and ordinances or duly adopted and published rules of court, and with all applicable record-keeping, reporting and disclosure requirements;

3.    Defendants from stating or suggesting, at any time, to any person whom they have detained or arrested or who is in their custody (a "Detainee"), that there is something that the Detainee could or should do for the personal benefit of the arresting officer of [sic] other law enforcement officer or government official, whether in the nature of conferring a monetary benefit or otherwise, to influence any decision to detain or continue to detain the Detainee, to charge the Detainee, or to
drop charges against the Detainee; and

4.    Defendants from engaging in racially[]discriminatory policing practices; and

5.    Affirmatively enjoining Henderson, the City of Lexington, and the Lexington Police Department to implement such policies and programs for training, compliance, and promotion as may be required to ensure the non-recurrence of discriminatory, unlawful and unconstitutional acts and practices.

FAC [35] at 28–29.

Defendants move to dismiss that relief on four primary grounds:  (1) there is no actual success on the merits; (2) Russell seeks improper obey-the-law relief; (3) there is no irreparable injury; and (4) Russell lacks standing.

### a.    Success on the Merits

For starters, Russell cannot establish actual success on the merits for the claims this Order dismisses.  But Russell could seek injunctive relief for his Title VI claim against the City.  *See Alexander*, 532 U.S. at 279 ("[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages.").

### b.    Obey-the-Law Injunction

Defendants next say Russell seeks an obey-the-law injunction that is too vague to satisfy Rule 65(d)(1)(b).  Defs.' Mem. [39] at 25.  That rule requires courts to "state [the injunction's] terms specifically."  Fed. R. Civ. P. 65(d)(1)(b).  Russell does "not quibble with [that] proposition."  Pl.'s Mem. [44] at 34.  Nor could he.  "A general injunction which in essence orders a defendant to obey the law is not permitted."  *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 373 (5th Cir. 1981).  Russell claims instead that his "Prayer for Relief contains nothing comparable to the 'obey the law' injunctions at issue in the cases defendants cite" and that he disavows that relief.  Pl.'s Mem. [44] at 34–35.[8]

---

[8] His prayer includes an injunction that would require the City to implement policies and training, but he also seems to seek obey-the-law type relief.  *See, e.g.*, FAC [35] at 28 (seeking injunction preventing "Defendants from interfering with the Fourth and Fourteenth Amendment rights of persons," violating state and local laws, and "engaging in racially[]discriminatory policing practices").  Russell has waived any relief that seeks an obey-the-law injunction, but given his arguments, it is unclear where he draws that line.

To the extent there is ambiguity over what Russell disavowed (i.e., what remains), now is not the time to challenge it. In *Littell v. Houston Independent School District*, the district court had granted a Rule 12(b)(6) motion to dismiss what it considered a prayer for an obey-the-law injunction. 894 F.3d 616, 631 (5th Cir. 2018). The Fifth Circuit reversed. The court first noted that "it is far from clear that Rule 65(d)"—which states what a trial court must include in an injunction—"can ever justify dismissing a cause of action at the pleading stage." *Id.* The court then held that "to the extent Rule 65(d) can theoretically justify a pleading-stage dismissal, moreover, we expect that it can do so only if there is no conceivable way to frame the requested relief in adequately specific terms," which was not the case there. *Id.* (holding that "at the pleading stage, the rule that injunctions must do more than 'order the defendant to obey the law' cannot justify the dismissal the district court entered here"); *see also id.* at 631 n.10 (collecting cases).

*Littell* forecloses Defendants' obey-the-law argument for now. Even if dismissal were "theoretically" possible on this basis, there is a "conceivable way to frame the requested relief in specific terms." *Id.* at 631. Like the *Littell* plaintiffs, Russell seeks improper relief, but he also seeks an injunction compelling Defendants "to implement such policies and programs for training . . . to ensure [] non-recurrence." FAC [35] at 28–29; *see Littell*, 894 F.3d at 632 (holding that district court could properly order "that some type of in-person training" occur). The obey-the-law argument must wait.

### c.    Lack of Irreparable Injury

An injunction may issue under Rule 65 if the court finds, among other factors, "that irreparable injury would result to the movant in its absence." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Defendants say Russell is not from Lexington and

nothing in his FAC suggests that he plans to go back.  Therefore, any prospective relief would not prevent future injury to him.  Defs.' Mem. [39] at 25.

Russell never directly addresses the irreparable-injury argument, but, as noted, he generally says these issues are not decided at the pleading stage.  Looking at Defendants' authority, they cite three circuit cases addressing the irreparable-injury requirement.  *Id.* at 27.  But those cases reviewed orders on motions for preliminary injunction, not motions to dismiss on the pleadings.  *See Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004) (affirming denial of preliminary injunction); *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011) (affirming preliminary injunction); *Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 357 (5th Cir. 2017) (vacating injunction).  And when Russell challenged the propriety of addressing these issues now, Defendants cited only *Carpenter v. Twin City Fire Insurance Co.* in their reply.  Defs.' Reply [47] at 12 (citing No. 3:23-CV-769-N, 2024 WL 455342 (N.D. Tex. Feb. 2, 2024)).  But *Carpenter* addressed standing, which raises different legal concerns.

While Defendants' cited cases did not address dismissals, *Littell* did, and its dicta may suggest that now is not the time.  Although in the Rule 65(d) context, the Fifth Circuit cited two cases suggesting that motions to dismiss are not the way to challenge injunctive remedies.  *See Littell*, 894 F.3d at 631 n.10 (citing *City of New York v. A–1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353–54 (E.D.N.Y. 2007) ("[A] motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought.  It is the court that will craft any remedy.  Only when that remedy has been determined may defendants contest its application on grounds of vagueness or some other violation of Rule 65(d)[.]"); *W. Colo. Fruit Growers Ass'n, Inc. v. Marshall*, 473 F. Supp. 693, 699–700 (D. Colo. 1979) (agreeing that requested injunction might

28

violate Rule 65(d) but explaining "[t]he equitable nature of injunctive relief . . . renders such claims particularly unsuited for disposition in a motion to dismiss")).

Defendants are correct that Russell must eventually show irreparable injury. But on these arguments, Defendants have not shown that they may challenge the relief sought—rather than the causes of action—at the pleading stage.

> d.    Standing

Standing is another matter. Defendants argue that "Russell does not have standing to obtain the relief he wants, particularly an injunction applicable to people that are not parties to this lawsuit." Defs.' Mem. [39] at 27. That statement could mean two things: (1) Russell lacks standing to seek injunctive relief for himself or (2) he lacks standing as to third parties.

The former could link to Defendants' argument that Russell failed to plausibly allege that he faces a likelihood of future injury. *Id.* at 25. That argument might have some weight. *Laird v. Spencer*, No. 20-30237, 2025 WL 79826, at *7 (5th Cir. Jan. 13, 2025) ("Past exposure to illegal conduct does not in itself show a present case or controversy . . . if unaccompanied by any continuing, present adverse effects.") (quoting *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003)) (internal quotation marks omitted). But Defendants never directly linked standing to the lack of irreparable harm, arguing instead that Russell failed to show irreparable injury under Rule 65. And the cases Defendants cite to support their standing argument all relate to third parties. *See* Defs.' Mem. [39] at 27. So if Defendants intended this argument, they did not put Russell on notice of it, and the Court lacks sufficient briefing. The motion is denied as to this relief.

That's not true for the third-party-standing argument. Defendants attack that point, yet Russell barely addresses it in his response. At most, he offers this: "*See generally Meyer v.*

*Brown & Root Construction Co.*, 661 F.2d 369, 374 (5th Cir. 1981) ('Injunctive relief which benefits non-parties may sometimes be proper even where the suit is not brought as a Rule 23 class action.') (citation omitted)."  Pl.'s Mem. [44] at 32.  But Russell never explains why this is one of those times.

To begin, Russell offers no binding authority suggesting that standing cannot be considered with a motion to dismiss.  Indeed, standing is a "threshold" issue.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 (1992).  And as the party invoking jurisdiction, Russell has the burden of proving it exists.  *Id.* at 561; *see Carpenter*, 2024 WL 455342, at *3 (dismissing injunctive relief because plaintiff failed to prove standing).

As for *Meyer*, that court did say that "sometimes" a plaintiff can seek relief for others.  661 F.2d at 374.  But the Fifth Circuit explained and distinguished *Meyer* in *Gordon v. JKP Enterprises Inc.*:

> [O]nce the judicial machinery has been set in train, the proceeding takes on a public character in which remedies are devised to vindicate the policies of the Act, not merely to afford private relief to the employee."  *Hutchings v. U.S. Indus., Inc.*, 428 F.2d 303, 311 (5th Cir. 1970).  Thus, injunctive relief which benefits individuals not party to the action may sometimes be proper even where the suit is an individual action, as opposed to a class action.  *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373-74 (5th Cir. 1981).

No. 01-20420, 2002 WL 753496, at *7 (5th Cir. Apr. 9, 2002).  But because the plaintiffs in *Gordon* no longer worked for the employer and did not seek reinstatement, they demonstrated no "way in which they would benefit from the injunction."  *Id.* (citing *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563-64 (5th Cir. 1998) (holding that unsuccessful job applicant lacked standing to procure injunctive relief where applicant alleged only single, past violation, did not indicate that he planned to seek employment with employer again, and did not purport to represent specific class of individuals in danger of discrimination); *Miller v. Tex. State Bd. of*

*Barber Examiners*, 615 F.2d 650, 654 (5th Cir. 1980) (holding that injunctive relief was inappropriate because suit was not class action, plaintiff was former employee, and plaintiff was not entitled to reinstatement)).  The *Gordon* court reversed injunctive relief that would have benefited third parties.

*Gordon* is not directly on point.  But even *Meyer* says that seeking injunctive relief for non-parties is only "sometimes" appropriate, 661 F.2d at 374, and Russell has not explained why it would be here.  The Court finds that Russell has not met his burden to demonstrate standing to pursue injunctive relief for third parties.  Russell is therefore directed to show cause as to standing.[9]

IV.    Conclusion

The Court has considered all arguments.  Those not addressed would not have changed the outcome.  The § 1983 claims in Counts I, II, III, IV, V, and VIII are dismissed with prejudice as to all Defendants until Russell satisfies the *Heck* conditions.  His equal-protection claim against Henderson in Count VI is dismissed based on qualified immunity.  Dobbins's motion to dismiss Count VI is denied.  The City's motion to dismiss the Title VI claim in Count VII is denied as moot.  Russell's motion for leave to file the SAC is granted as to Count VI against Dobbins and Count VII against the City.  The Court finds that Russell has not met his burden of showing standing to pursue claims on behalf of third parties and that he has waived obey-the-law

---

[9] This is a complicated issue that required more than what was provided.  While the Court generally finds that Russell did not meet his burden, the Court lacked full briefing on this jurisdictional issue.  *See Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494, 496 n.1 (5th Cir. 2007) (en banc) ("Standing is a jurisdictional requirement and not subject to waiver.").  So when Plaintiff files the SAC, he should separately respond to this Order and show cause why standing exists to pursue injunctive relief for himself and third parties.  If he can successfully do that, the Court will consider allowing amendment.  But given that Russell is already on his third pleading, he must do so within 14 days.

injunctive relief.  Russell must file a second amended complaint that complies with this Order within seven days and show cause within 14 days why he has standing to seek injunctive relief for himself or third parties.

      **SO ORDERED AND ADJUDGED** this the 20th day of March, 2025.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE